All right, appellant, are you ready to proceed? They're on that side. All right. Mr. Shorman? Good morning, Your Honor. Yes, I'm Dan Shorman. I'm representing the appellant in this case, Harry Jackson. All right, you may proceed. Thank you, Your Honor. Last month, before the annual convention in Boston, Chief Justice John Roberts addressed the American Bar Association  of the signing of the Magna Carta. He emphasized that Magna Carta's history teaches that no generation is spared its challenges, that many factors have shaken public faith in government across the board. The Chief Justice said that the bench can bolster public confidence by exercising independent judgment to reach sound decisions carefully explained. Your colleagues, Judges Smith, DeMoss, and Stewart, followed that course in a case actually cited by FEMA in its brief. Reversing summary judgment in Trotter v. BPB America, Inc., they found that both the plant superintendent and a floor sweeper, certainly a greater dichotomy than that between Harry Jackson and James West Blair, had participated in the same incident, a workplace altercation, much akin to the incident of August 28, 2006, witnessed by Chris Fusilier, an employee of nearby Lighthouse Tabernacle Church. You'll find that at record 202 and 409. The significance cannot be understated, as this honorable court has determined in the 2004 Perez decision. The Trotter case is also instructed in that the decision maker, unlike George Smith and his subordinate FEMA manager, David Phillips, initially did not take disciplinary action because he did not have all witness statements for review. Phillips, however, banned Harry Jackson from FEMA's Lake Charles worksite just after the noon hour, 12.37 p.m. to be precise. That's at record 269. Smith suspended Harry that same day, 6.58 p.m., not with pay pending investigation, mind you, but without pay, record 271. What's the district court error you're alleging? What's the error you're asserting? What's the error you're indicating? Are you going to the recusal question? No, Your Honor, I'm talking about the substance of the evidence which showed that there clearly were, at the very least, Your Honor, credibility determinations in the weighing of evidence which, unfortunately, the district court engaged in improperly according to the Reeves decision. So that's what I'm talking about. I'm certainly happy to discuss the recusal issue, but as Your Honors are well aware, there is a presumption of discriminatory intent because the supervisor of one race treats employees of the same race more favorably. That's the 85 Burns v. Yellow Frake decision. And the similarly situated individual here is Blair? Yes, Your Honor, because it's the same incident, you don't get into all those factors, although actually the evidence isn't as my worthy opponents would have it because, as Blair has testified, he was a project manager. But the Trotter case, along with Perez, shows that plant superintendent, floor sweeper, same incident, all those other factors about who's getting paid more, who's got a better title, that's not a consideration in that scenario. The Southern District of Texas in 05, the Guijardo case, held that selective enforcement necessarily draws an inference of discrimination and retaliation. This court in Lee v. Kansas City Southern Railway in 09 recognized that a requirement of total identity rather than near identity would be essentially insurmountable. So your position is Blair's grade level is not a sufficient distinction to matter? That's true, Your Honor, but more important is the fact that they were in the same incident, that same altercation that happened where they had the one witness from the church. I thought the record was fairly clear that Blair had no record of prior abusive behavior, whereas your client had an extensive record. That is not true. Okay. The so-called evidence of any problems with Harry Jackson, the district court actually derived from the complaint where we're saying that they came up with all this other stuff in order to make sure they got this guy kicked out the door. And, of course, there's also evidence in the record of problems with Blair, testimony from Ashley Banks and other co-employees about Blair's own situation. And, of course, we have Blair's inconsistencies, testimony where, you know, one time he says that he was hit on the nose, another time not, one time he says profanity, not. The inconsistencies are there. Plus, the case law says that post acts and omissions are relevant. And what do we have in the record showing the total uncooperativeness on the part of Blair? Was there a separate incident not involving Blair on August 23rd of 2006 but involving your client, or was that the same one? That was an allegation by Mr. Conner, you know, saying, I mean, there's nothing, remember, there's no personnel file of Harry Jackson in the record. This is, you know, an email. That's the allegation that your client responded in a negative and profane manner when a co-worker asked a question. Is that... That's what Mr. Conner said. But you know, Your Honor, there was... And then there's an allegation that your client was rude and hostile in a conversation with a co-worker who offered to assist him. That was around the same time, in August of 2006. There was that allegation. Is that right? The allegation. All on here said... That was not true either. That's correct. There was, at the very least, Your Honor, if the court below had even considered what Harry Jackson had to say about it, not true. I mean, this was something that... And then there's a separate incident report where your client was involved in a confrontation with a co-worker where the allegation is that there was foul language and that there was some physical contact. Is that right? That... That's another incident. No, Your Honor, the only... Where there was alleged physical contact. But remember, there's one eyewitness. That's Mr. Fusilier. And what is he saying? And the Blair incident is separate from the incident involving the contract security guard? That's another incident. Is that right? Separate alleged incident. But remember, in the record, Your Honor... So that's one more untrue allegation, is what you're saying. That's correct. And in the record, you've got the inconsistency. That's Joanne Easley. When the date of the incident, she's saying that there's not a word about any profanity. But, you know, when they're getting her declaration preparing to defend a lawsuit, all of a sudden there's this extreme profanity, total inconsistency. And, of course, in the record, Harry Jackson did not know about any of these accusations. They never told him about this stuff, all these other things. That was drummed up, you know, in order to make sure they could get this guy fired. The only thing that makes any sense here is that race was a factor, Your Honor. I want to say something about the... You mentioned the allegation regarding Mr. Conner. You know, there was actually... That matter became tested at the unemployment hearing. And it really is significant. There were... The finding was that there were no specific violations of any company policy. And the ALJ also said, in addition, performance of what steps he could take to ensure that he complied with policies. There's no proof of any incident or misconduct that resulted in his discharge. That's at record 434. Your Honor, in the Ducote case, this is the Louisiana Supreme Court, it held that an employer cannot simply indent a violation of a rule or stretch the truth in order to excuse the firing of an employee. And what do we have in the record, Your Honor, at 375 and 492? John Ward, that's the immediate supervisor, the only African-American in Harry Jackson's chain of command, and he's saying that the complaints of Thigpen and Judy Williams, that's involved in all these other incidents that you're questioning, Your Honor, they were not sent to him. The immediate supervisor didn't know about this stuff. Not only did Harry Jackson know about it, John Ward didn't know about it. And at the hearing, this unemployment hearing, Tanya Thigpen was there, as was Thomas Hofius, the security manager, and also testifying by telephone was David Conner. This is FEMA's individual assistant section chief who, according to the district court, this is at record 675, he states that Harry Jackson was terminated because he displayed continuous, explosive, uncooperative, disrespectful behavior unbecoming a federal employee. But you know something? His testimony wasn't believed. There was actually an actual chance, which Harry Jackson didn't get in the trial where a judge and jury would decide credibility, but the ALJ rejected it. He filed for Harry Jackson. And here's these three management officials, Thigpen, Hofius, and Conner testifying, rejected. And how does FEMA deal with this ALJ decision, this inconvenient truth? I'll tell you, footnote 17 of its reply memo, it says here, the agency, for resource allocation and other reasons, may have foregone the opportunity to present more compelling evidence to contest an award of employment benefits. Talk about self-serving, conclusory, and speculative. Just not credible. The district court discounted the direct evidence of the use of the N-word by FEMA's human services branch chief, Guy Bonanno, Blair's direct supervisor, Brian Boyle, and downplayed by the district court, a Mr. Smith. All three is just simply FEMA employees. George Smith, the man who suspended Harry Jackson, a Mr. Smith like he's some kind of bystander? The source of that racial evidence is a manager himself, Steve Reams, who had a staff in four different FEMA sites, New Orleans, Baton Rouge, Harahan, and Lake Charles. Reams is cc'd, along with Phillips, Bonanno, and Ward, on the August 22nd, 2006 email from Smith to Gary Kaiser to have Harry and Connor, quote, stand down on your actions. That's at record 255. Reams is also cc'd, along with Smith, Kaiser, Ward, and Ruth Jackson, no relation, on the Bonanno, September 30th, 2006 email of Harry Jackson, James Stark, that's Smith's boss, and Tanya Thigpen, that Thigpen will be Bonanno's eyes and ears, and that Harry's request to meet the director is unwarranted and therefore denied. In the record, the numerous attempts for Harry Jackson to give his side of the story, rejected. That's record 429, that email, Your Honors. Contrary to the district court's conjecture, the context throughout the record is pervasive. Consider the testimony of FEMA EEO director Carol Nichols at record 525. People complained to me about referring to the people as New Orleans niggers. Question, did you ever talk to George Smith about these allegations of his manager's subordinates using the N-word? Answer, yes, I did. Question, did Mr. Smith ever show you where he took some sort of investigation into an allegation of one of his managers using the N-word? Answer, no. I felt that, yes, he was blowing me off. Question, do you think that this very smart, articulate, very professional man, Stephen Reams, would have had the same problems with Mr. Smith, Bonanno, Boyle, et al., if he had been white? Answer, actually, no. Thank you, Mr. Sherman. You're out of time. Thank you, Your Honor. Appellee. Good morning, Your Honors. Catherine Maher on behalf of the United States. I want to respond first to some of the things that Mr. Sherman brought up. As to the instance and how they occurred, I'll explain a little bit to the court, because I know Judge Graves, you had some questions. On August 22nd, first of all, Harry Jackson arrived at the Lake Charles office as a temporary assignment for two to three days a week on August 14th. At that time, he did not meet directly with David Connor, who was in charge of the individual assistants and in charge of the Lake Charles office at that time. He finally met with him in person on August 22nd, 2006. At that time, in their first conversation, Harry Jackson called Mr. Connor, and this is in his deposition testimony, which is cited in my brief. He called him a liar twice during the conversation, and he also refused to move his workspace at Mr. Connor's request. Mr. Connor's affidavit, which is attached to summary judgment and is also cited in my brief, was that Mr. Smith had directed Connor to have Mr. Jackson sit near the housing office to be more assistant to the housing office, which was the whole reason that Mr. Jackson was asked to go to the Lake Charles office in the first place, was to assist the housing office. When he wrote a follow-up email, David Connor wrote a follow-up email saying, I'm going to communicate with you in email from this point forward. I'm asking you again to move your office and to get the reports that I need. He wrote back and wrote in all caps, none of this is going to happen. That set the tone for the whole encounters that Mr. Jackson had in Lake Charles in this August 22nd is the first thing that he had, and that's with the head of the Lake Charles branch. That whole conversation was reported to Mr. Smith, George Smith, who was up the chain, both of those supervisors up the chain. He was in New Orleans. He was not in Lake Charles. He had not seen Harry Jackson at that time. He did not know his race. August 23rd, David Connor gets a report, which he reports to Smith that he is rude, that Mr. Jackson is rude to Tanya Thigpen, hangs up the phone on her, doesn't shake her hand when she extends it. There's another allegation that he was profane about management with Judy Williams in front of other employees. Judy Williams does not have any... We don't have any testimony from her. We do have Tanya Thigpen's testimony to corroborate both that that's what happened and that's what she reported to both Smith and Connor. We have Connor's testimony that he reported all of these up to Smith. The fourth incident from the 22nd to the 28th, which is less than a week, was the altercation with Mr. Blair. And Mr. Blair reported that he had had an altercation with Mr. Jackson in the parking lot to David Connor, who instructed him to report to the security guard. Once Mr. Smith saw the report of the security guard, he became very concerned that Jackson's conduct was elevating. After all, this is a period of less than a week. And he decided to suspend him at that point. At that point, he did not know he was African American. He had never met him. That was what Smith said in his declaration. That is also what Harry Jackson testified to in his deposition. Okay, on 217 of his deposition. He had never seen Mr. Smith as of the day of the suspension. There's simply no indication that Mr. Smith, who made that determination at that point, had any discriminatory animus against Mr. Jackson because he did not know he was African American. Turning to then... So August 28th, he suspends him. He suspended him initially for two weeks. There's some correspondence in the record that indicates he meant to make it a week suspension. There's also Mr. Smith's declaration in the record that he understood it was later for pay. September 22nd, Mr. Jackson files an EEO complaint alleging discrimination based on race. On October 24th, he is involved in an altercation with the security guard. The security guard writes a report saying that Jackson screamed at her and threatened to have her fired. She reports this to her supervisor, Thomas Hopheus, who is the FEMA security guard at FEMA Park. He writes a long e-mail to Mr. Smith. Both the security guard report and Mr. Hopheus's e-mail are attached to Mr. Smith's declaration, and that's what he received at the time. And Mr. Hopheus stated that Mr. Jackson called the security guard idiots. He told Mr. Hopheus he didn't know what the security guards were smoking or eating. He was very rude to them on the phone, and he had concerns for him. At that point, Mr. Smith decided to terminate Mr. Jackson, and he had sent a letter up the chain to begin his termination. The termination was final on November 21st. That's the sequence of events. Very telling, after August 28th, when he was suspended, on September 1st, Mr. Smith wrote a letter to Mr. Stark, who was, I'm sorry, Mark Roy, who was the chief of staff, and ceded it to John Ward, Mr. Jackson's supervisor, Fabanomo and others, and said, Mr. Jackson has to understand that he has one more chance. There will be zero tolerance, and zero is bolded in the original, for any further incidents of unprofessional behavior. August 24th was the last straw for Mr. Smith, and he terminated him. That's all very clear in the record, Your Honour, as far as being set forth. Mr. Jackson's only evidence, he says, of that there was a racial animus is the so-called direct evidence of the use of the N-word. There was no direct evidence of the N-word being used. There were witnesses who said they'd heard rumours that Fabanomo or George Smith had used the N-word, or maybe Brian Boyle. The one person they had targeted as having said, I heard him say it, was Stephen Miller. Stephen Miller, whose deposition testimony is attached to the summary judgment to the reply brief, says, I never heard them say the N-word. That only direct evidence could have come from Stephen Miller. He said he never heard it. Carol Nichols reported that she had had employees report allegations of use of the N-word, but that was so out of context to anything that involves Mr. Jackson, and there was no temporal proximity to it. The only other evidence he has pointed to is that he was black and he was treated unfairly, but he has no evidence that Mr. Smith considered race in any of these decisions. In fact, all the written, documented evidence that the court had showed otherwise. Unless there's any other questions on this point, I'll rest on my briefs. Thank you. Rebuttal. First of all, Your Honor, with regard to the so-called inconsistent statements, the Copeland case, this court in 02, said that an affidavit impeaches without explanation. But, Your Honor, if you look at the very detailed explanation, this is record 579 and 80, where Harry Jackson goes into the details of that meeting that he had. And if you look at record 262, this is the George Smith declaration, and he says there at paragraph 8, I had never met him in person. But in that same paragraph, it also says, the decision was based on Jackson's aggressive and hostile confrontation with a fellow employee. Jackson's prior hostile behavior at the Lake Charles field office was also at the forefront of my mind at the time. All of that's hearsay. Nothing in Harry Jackson's personnel file. That's no more credible than this I had never met him in person. That was another issue that a jury has to decide who to believe. They want to try and undermine the credibility because he didn't remember at the time he's being deposed. That's fair. But that's what a trial is about. With regard to Steve Miller, when I deposed him, question, do you have any information to refute what Mr. Ream says? Answer, no. And what does Calum Nichols have to say about it? When I question about a convenient lapse of memory on the part of Mr. Miller, who's still working for FEMA, I remember him mentioning that they could make his life miserable. And it is not just black people that speak out. But if you are a white person that spoke about black people getting treated differently, then that could cause you some grief from the people that were causing problems. That was what was in Steve Miller's mind when he had that convenient lapse of memory. Steve Reams is telling the truth about that meeting. That's what happened. John Ward, also afraid of losing his job, he testifies, this is what Harry Jackson is saying, that's your example of Mr. Ward not going against Mr. Bonomo? Answer, beside the point where I said that Ward had told me earlier, he wasn't going to go against him. Ward was afraid if he didn't do what the guy asked him to do, his job would be in jeopardy. Question, who told you about that? Answer, Ward. This is what Ward, certainly an exception here, says he's the immediate supervisor. That's what Harry Jackson was told by his own supervisor, that he was afraid for his own job. And there's a lot of evidence in the record about just what kind of character Guy Bonomo was. Aggressive, ruthless kind of guy. Characterized as a mafia type. John Ward would not even write a performance evaluation on Harry required by his new federal employee, the U.S. Army, in California. That happened between April and September of 2007 when Harry finally got another job after being unemployed for six months because of this illegal discrimination. You know, the Burns case says we don't have to come up with a confession on the part of the employer, but, you know, we actually have it. You look at Record 408. This is the investigation. Response, Mr. Ward stated, Mr. Jackson, complainant, has been subjected to a hostile work environment in the manner in which Jackson's integrity is questioned. Opinions were made and determinations of fact are reached without regard to Mr. Jackson's side of the story. That's what happened in this case, Your Honors. Ward testifies when I take his deposition. Because Mr. Smith was at the top of the chain of command, he chose to suspend Harry, questioning why did he make that choice. Answer, I have no idea. That's the immediate supervisor. He's cut out of the chain, the one African-American in that chain. They cut him out, this man who's afraid of his own job. He says, I didn't know anything about the termination. So that's either the suspension provided the information, and once again, the suspension took place that same day. So there was no time for any discussions of anything. Mr. Smith made his decision. That's the testimony at Record 491 of John Ward. You talk about retaliation. Look at 456. This is that contract. You want to have an independent witness? I had two phone calls with Garman. Thank you very much. You're out of time. Thank you, Your Honor. Thank you. The court will take this matter on its own.